UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.

MATTHEW D. ADAMS,

          Defendant.

Case No.  23-cr-20013
Hon. Matthew F. Leitman

_____

## **PLEA AGREEMENT**

The United States of America and the defendant, MATTHEW D. ADAMS, have reached a plea agreement under Federal Rule of Criminal Procedure 11.  The plea agreement's terms are:

**1.    Count of Conviction**

Defendant will waive his right to an indictment and will plead guilty to Counts 1 and 2 of the Criminal Information.  Count 1 charges Defendant with money laundering in violation of 18 U.S.C. § 1957.  Count 2 charges Defendant with corruptly endeavoring to obstruct and impede the due administration of the Internal Revenue Laws in violation of 26 U.S.C. § 7212(a).

1

**2.    Statutory Minimum and Maximum Penalties**

Defendant understands that the counts to which he is pleading guilty carry

no statutory minimum penalties and carry the maximum statutory penalties as

follows:

| Count 1 | Term of imprisonment: | 10 Years |
|---------|------------------------|----------|
|         | Fine: | $250,000 or twice the amount of the criminally derived property |
|         | Term of supervised release: | 3 Years |
| Count 2 | Term of Imprisonment | 3 Years |
|         | Fine | $250,000 or twice the amount of the tax loss |
|         | Term of Supervised Release | 1 Year |

**3.    Agreement Not to Bring Additional Charges**

If the Court accepts this plea agreement, the government will agree not to

prosecute Defendant MATTHEW D. ADAMS for the conduct, and related

conduct, described in the statement of facts herein at paragraphs 5 and 8d.  The

agreement not to prosecute Defendant for the conduct described in those

paragraphs is limited to conduct that is known to the government as of the date the

guilty plea is entered.

**4.    Elements of Counts of Conviction**

The elements of Count 1 are:

2

A.    The defendant knowingly engaged or attempted to engage in a monetary transaction;

B.    Knowing that the transaction involved criminally derived property;

C.    The criminally derived property had a value greater than $10,000;

D.    The criminally derived property was derived from a specified unlawful activity; and

E.    The monetary transaction took place in the United States.

The elements of Count 2 are:

A.    The defendant corruptly;

B.    Endeavored;

C.    To obstruct or impede the due administration of the Internal Revenue Code;

D.    Regarding a proceeding of which he was aware.

## 5.    Factual Basis for Guilty Plea

The parties agree that the following facts are true, accurately describe Defendant's role in the offense, and provide a sufficient factual basis for Defendant's guilty plea:

Defendant MATTHEW ADAMS was a resident of Grosse Pointe Park, Michigan. Defendant was initially an employee of Company A before leaving that company's employment and starting his own company, MDA Property Services ("MDA"). MDA was a contractor for Company A.

Between 2013 and 2017, Defendant illegally sold more than $10 million in narcotics to Individual A. Individual A was the President of Company A. These narcotics were paid for with funds

3

embezzled from Company A. Defendant was paid for these narcotics with checks, which were either made out to Defendant individually, or to one of his companies – most frequently MDA.[1] These payments were made to appear like they were for legitimate work performed by Defendant or Defendant's company to conceal the nature and purpose of the payment.

Specifically, in regards to Count One, on the following dates, in the Eastern District of Michigan, Defendant deposited checks in the following amounts into a bank account under his control which, as he knew at the time, constituted the proceeds of illegal narcotics sales:

| Date | Payor | Payee Name | Amount | Bank Acct. # ending |
|------|-------|-----------|--------|---------------------|
| 7/31/2017 | Company A | MDA Property Services LLC | $21,750 | x2185 |
| 7/31/2017 | Company A | MDA Property Services LLC | $11,550 | x2185 |
| 8/3/2017 | Company A | MDA Property Services LLC | $21,450 | x2185 |
| 8/3/2017 | Company A | MDA Property Services LLC | $12.750 | x2185 |
| 8/9/2017 | Company A | MDA Property Services LLC | $23,775 | x2185 |
| 8/23/2017 | Company A | MDA Property Services LLC | $14,280.20 | x2185 |
| 8/23/2017 | Company A | Andary Acquisitions, LLC | $19.550 | x2185 |
| 8/31/2017 | Company A | Andary Acquisitions, LLC | $19,500 | x2185 |
| 8/31/2017 | Company A | MDA Property Services LLC | $17,500 | x2185 |
| 10/10/2017 | Company A | MDA Property Services LLC | $17,500 | x2185 |

From 2014 through 2017, Defendant deposited checks exceeding $10,000 that constituted the proceeds of illegal narcotics sales, which he knew at the time, into bank accounts under his control, that totaled approximately $4,990,987.

Defendant began selling illegal narcotics to Individual A in or around 2007 or 2008. At that time, Defendant was an employee of Company A. Company A provided maintenance services for foreclosed properties. As time passed, Individual A's drug use

---

[1] Defendant had additional businesses, including Andary Acquisitions, LLC.

increased.  At some point in or around 2008, Individual A began to pay Defendant for the narcotics from Company A's bank accounts and, by in or around 2010, all narcotics purchased by Individual A were paid for with money from Company A.

Defendant and Individual A frequently communicated about the narcotics sales via text messages.  In those texts they discussed the type of opiate pills Defendant had or could supply, when Defendant's supplier dropped off the pills at Defendant's business, where and when Individual A would receive the narcotics from Defendant, and the cost of the narcotics.  Throughout the period Defendant sold narcotics to Individual A, Defendant determined the price of the narcotics.  At the beginning, Defendant charged approximately $25 to $50 per pill.  By in or around 2014 to 2017, Defendant charged approximately $150 to $175 per pill.

In or around 2012, Defendant ended his employment with Company A and formed his own company, MDA Property Services. MDA Property Services provided building maintenance services. MDA Property Services became a contractor for Company A. Company A was MDA Property Services' only customer.

At some point after Defendant formed MDA Property Services, Defendant and Individual A agreed to use the contractor relationship between Company A and MDA Services to conceal the narcotics purchases by making the payments look like payments for legitimate work.  From in around 2012 through January, 2016, MDA did perform legitimate work for Company A as a contractor.  All payments Defendant or his businesses received from Company A were by check.

| Payments from Company A to Defendant | | | | | | |
|---|---|---|---|---|---|---|
|  | 2013 | 2014 | 2015 | 2016 | 2017 | Totals |
| Legitimate Work | $42,665 | $112,580 | $126,040.25 | $14,425 | $0 | $295,710 |
| Narcotics Sales | $1,374,830 | $1,258,360 | $2,091,150 | $2,987,000 | $2,401,991.15 | $10,113,331 |

5

Defendant deposited some of the checks received from Company A in his personal bank account, some of the checks into various other bank accounts, including business bank accounts, and cashed the remainder of the checks at a local liquor store. Most, if not all, of the checks cashed at the liquor store were made payable to Defendant, personally. All of the checks cashed at the liquor store were payments from Individual A to Defendant for narcotics. Between 2011 and 2017, Defendant cashed more than $5.3 million in checks from Company A at the liquor store.

At some point between 2013 and 2014, Defendant and Individual A agreed that Individual A would cause Company A to issue IRS Forms 1099-MISC to Defendant or his business documenting all payments, including for narcotics, from Company A to Defendant and his businesses. Defendant agreed to this plan because it helped make his income from selling narcotics appear to be legitimate business income. This plan also helped Individual A cover up the nature and purpose of the payments from Company A to Defendant and his businesses.

Defendant and Individual A agreed that the Forms 1099-MISC would report all payments to Defendant and his businesses, both for legitimate work and for narcotics. Defendant and Individual A discussed that issuing these Forms 1099-MISC was going to create a paper trail of the payments for the IRS and was going to necessitate that Defendant and his businesses report the narcotics income to the IRS and pay taxes on that income. To account for this extra expense, at Defendant's request, Individual A agreed to pay Defendant extra money, beyond the normal cost of the narcotics, to pay the taxes Defendant was now going to owe.

Company A issued Forms 1099-MISC to Defendant or MDA Property Services for tax years 2013 through 2016. For each tax year, the amount of money reported on Form 1099-MISC as paid to Defendant or his businesses was less than the total amount paid by Company A to Defendant and his businesses, but significantly more than the amount paid for legitimate work.

6

Based on his agreement with Individual A, Defendant should have relied on the Forms 1099-MISC to prepare both his company's and his individual income tax returns, even though the Forms did not accurately report all payments made from Company A to Defendant, as intended. Instead, Defendant directed his tax preparer to use bank records to calculate his business's gross receipts rather than use the number reported on the Forms 1099. Defendant knew that these bank records did not report all of his narcotics income because he cashed checks constituting narcotics income and deposited checks into bank accounts about which he did not inform his tax preparer. In so doing, Defendant caused his tax preparer to prepare false tax returns for tax years 2013, 2014, 2015, 2015 first amended, 2015 second amended, and 2016, that underreported his total gross receipts by a total of $3.9 million. Defendant files these returns with the IRS.

Defendant did not receive a Form 1099-MISC for tax year 2017 because Individual A left Company A and entered a drug rehabilitation program in September 2017. Defendant did not timely file a business or individual tax return for tax year 2017 despite receiving $2.4 million from Company A for narcotics sales. Defendant and his business did not receive any payments from Company A in 2017 for legitimate work. In October 2021, Defendant filed a tax return for tax year 2017 for MDA Property Services that failed to report more than $600,000 in income he and his businesses received from Company A. This tax return was false since MDA Property Services did not perform any legitimate work for Company A in 2017 and the company did not have any other customers. Defendant has never filed an individual income tax return for tax year 2017.

In 2017, the IRS opened an audit examination of tax returns for Defendant and his business. Defendant was notified of the audit in June 2017. On December 6, 2017, Defendant made numerous false statements to an IRS Revenue Agent during an interview in furtherance of the audit. Specifically, Defendant stated that all income received from Company A was deposited into business bank accounts, that he did not engage in check cashing, that no checks were made payable by Company A to himself, personally, and that the Forms 1099-MISC overstated the amount paid from Company A to MDA Property Services'. Defendant again lied to the Revenue Agent

7

on March 27, 2018 by trying to conceal his check cashing activity. When confronted by the Revenue Agent about the check-cashing activity, Defendant stated that he was cashing checks to provide cash to Individual A for him to use to gamble on sports. This was not true. Defendant also stated that 90% of the money Defendant's company received from Company A was for legitimate work. Only three percent of the money Defendant and his companies received from Company A from 2013 through 2017 was for legitimate work.

On April 24, 2018, Defendant gave an interview with law enforcement officers. During that interview, defendant admitted selling narcotics to Individual A but stated that he kept only 1% of the money he received from Company A for narcotics. He claimed the other 99% was spent to acquire the narcotics he sold to Individual A. This statement was false.

Defendant used the proceeds of his illegal narcotics business to live a lavish lifestyle and acquire real property. Between 2014 and 2018, Defendant withdrew more than $1 million in cash from his business bank accounts, and spent more than $1.25 million from business bank accounts on personal expenses including private flights, golfing, jewelry, gambling, court-ordered child support, hotels, and to purchase a firearm. Defendant also purchased vehicles, including a Cadillac Escalade, a Hummer, and multiple classic cars.

## 6.    **Advice of Rights**

Defendant has read the Criminal Information, has discussed the charges and possible defenses with his attorney, and understands the crime charged. Defendant understands that, by pleading guilty, he is waiving many important rights, including the following:

A.    The right to plead not guilty and to persist in that plea;

B.    The right to a speedy and public trial by jury;

8

C.     The right to be represented by counsel — and, if necessary, have the court appoint counsel — at every critical stage of the proceedings, including trial;

D.     The right to be presumed innocent and to require the government to prove the defendant guilty beyond a reasonable doubt at trial;

E.     The right to confront and cross-examine adverse witnesses at trial;

F.     The right to testify or not to testify at trial, whichever the defendant chooses;

G.     If the defendant chooses not to testify at trial, the right to have the jury informed that it may not treat that choice as evidence of guilt;

H.     The right to present evidence or not to present evidence at trial, whichever the defendant chooses; and

I.     The right to compel the attendance of witnesses at trial.

**7.     Collateral Consequences of Conviction**

Defendant understands that his conviction here may carry additional consequences under federal or state law.  Defendant understands that, if he is not a United States citizen, his conviction here may require him to be removed from the United States, denied citizenship, and denied admission to the United States in the future.  Defendant further understands that the additional consequences of his conviction here may include, but are not limited to, adverse effects on the

9

defendant's immigration status, naturalized citizenship, right to vote, right to carry a firearm, right to serve on a jury, and ability to hold certain licenses or to be employed in certain fields. Defendant understands that no one, including the defendant's attorney or the Court, can predict to a certainty what the additional consequences of the defendant's conviction might be. Defendant nevertheless affirms that he chooses to plead guilty regardless of any immigration or other consequences from his conviction.

## 8. Defendant's Guideline Range

### A. Court's Determination

The Court will determine Defendant's guideline range at sentencing.

### B. Acceptance of Responsibility

The government recommends under Federal Rule of Criminal Procedure 11(c)(1)(B) that Defendant receive a two-level reduction for acceptance of responsibility under USSG § 3E1.1(a). Further, if Defendant's offense level is 16 or greater and Defendant is awarded the two-level reduction under USSG § 3E1.1(a), the government recommends that Defendant receive an additional one-level reduction for acceptance of responsibility under USSG § 3E1.1(b). If, however, the government learns that Defendant has engaged in any conduct inconsistent with acceptance of responsibility — including, but not limited to, making any false statement to, or withholding information from, his

10

probation officer; obstructing justice in any way; denying his guilt on the offense

to which he is pleading guilty; committing additional crimes after pleading guilty;

or otherwise demonstrating a lack of acceptance of responsibility as defined in

USSG § 3E1.1 — the government will be released from its obligations under this

paragraph, will be free to argue that Defendant not receive *any* reduction for

acceptance of responsibility under USSG § 3E1.1, and will be free to argue that

Defendant receive an enhancement for obstruction of justice under USSG § 3C1.1.

## C.     Other Guidelines Recommendations

The parties jointly recommend under Federal Rule of Criminal Procedure

11(c)(1)(B) that the following guideline provisions apply:

1.    Defendant's sentencing guidelines range should be calculated based on a laundered funds value of greater than $3.5 million but less than $9.5 million pursuant to U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1(b)(1)(J) of the sentencing guidelines, resulting in a base offense level of 26;

2.    The six-level enhancement at U.S.S.G. § 2S1.1(b)(1) applies because Defendant knew and believed that the laundered funds were the proceeds of an offense involving the distribution of a controlled substance or a listed chemical;

3.    The one-level enhancement at U.S.S.G. § 2S1.1(b)(2)(A) applies because Defendant was convicted under 18 U.S.C. § 1957; and

4.    The two-level adjustment at U.S.S.G. § 3C1.1 applies for obstruction because Defendant was convicted of 26 U.S.C. § 7212(a) and Defendant lied during an interview with law enforcement.

5.   After a two-level reduction under USSG § 3E1.1(a), and an additional one-level reduction under USSG § 3E1.1(b), the defendant's guidelines level is 32 corresponding to a term of imprisonment of **121-151 months** if the Court finds Defendant's Criminal History Category to be at Criminal History Category I.

The parties have no other recommendations as to Defendant's guideline calculation.

## D.   Factual Stipulations for Sentencing Purposes

The parties stipulate that the following facts are true and that the Court may, but is not required to, rely on them in calculating Defendant's guideline range and imposing a sentence:

MDA Property Services' tax returns for tax years 2015 and 2016 contained numerous false deductible business expenses. For tax year 2016, Defendant directed his tax preparer to classify more than $350,000 in charges to an American Express card as deductible business expenses. Defendant's business did not perform any work for its sole customer after January 2016. Most of these expenses were personal, and not deductible business expenses, including more than $87,000 spent on private airline flights and other airline travel.

The parties have no additional factual stipulations for sentencing purposes.

## E.   Parties' Obligations

Both Defendant and the government agree not to take any position or make any statement that is inconsistent with any of the guideline recommendations or factual stipulations in paragraphs 5, 8.B, 8.C, or 8.D. Other than the guideline recommendations and factual stipulations in those paragraphs, however, neither

12

party is restricted in what it may argue or present to the Court as to Defendant's guideline calculation.

### F.   Not a Basis to Withdraw

Defendant understands that he will have no right to withdraw from this agreement or withdraw his guilty plea if he disagrees, in any way, with the guideline range determined by the Court, even if that guideline range does not incorporate the parties' recommendations or factual stipulations in Paragraphs 8.B, 8.C, or 8.D.  The government likewise has no right to withdraw from this agreement if it disagrees with the guideline range determined by the Court.

## 9.   Imposition of Sentence

### A.   Court's Obligation

Defendant understands that in determining his sentence, the Court must calculate the applicable guideline range at sentencing and must consider that range, any possible departures under the sentencing guidelines, and the sentencing factors listed in 18 U.S.C. § 3553(a), and apply any applicable mandatory minimums.

### B.   Imprisonment

#### 1.   Recommendation

Under Federal Rule of Criminal Procedure 11(c)(1)(B), the parties jointly recommend that Defendant's sentence of imprisonment not exceed the midpoint of the defendant's guideline range as determined by the Court.

### 2.    No Right to Withdraw

The parties' recommendation in paragraph 9.B.1 is not binding on the Court. Defendant understands that he will have no right to withdraw from this agreement or withdraw his guilty plea if the Court decides not to follow the parties' recommendation. The government likewise has no right to withdraw from this agreement if the Court decides not to follow the parties' recommendation. If, however, the Court rejects or purports to reject any other term or terms of this plea agreement, the government will be permitted to withdraw from the agreement.

### C.    Supervised Release

### 1.    Recommendation

Under Federal Rule of Criminal Procedure 11(c)(1)(B), the parties make no recommendation as to a term of supervised release.

### 2.    No Right to Withdraw

The parties' recommendation is not binding on the Court. Defendant understands that he will have no right to withdraw from this agreement or withdraw his guilty plea if the Court decides not to follow the parties' recommendation concerning the length of Defendant's sentence of imprisonment, as described above in paragraph 9.B.1, will not apply to or limit any term of imprisonment that results from any later revocation of Defendant's supervised release.

14

**D.    Fines**

There is no recommendation or agreement as to a fine.

**E.    Restitution**

Defendant agrees to pay restitution to the Internal Revenue Service in the amount of $3,354,973 pursuant to 18 U.S.C. § 3663(a)(3). Defendant agrees that the total amount of restitution reflected in this agreement results from his fraudulent conduct. The total amount of restitution consists of the following:

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|
| Unreported Income | $232,499 | $198,119 | $524,601 | $1,023,012 | $920,038 | $489,953 | $966,369 | $1,530,403 | $2,401,991 |
| **Tax Loss** | $80,525 | $68,036 | $184,529 | $365,367 | $386,297 | $214,450 | $412,554 | $656,317 | $986,898 |

Defendant agrees that restitution is due and payable immediately after the judgment is entered and is subject to immediate enforcement, in full, by the United States. If the Court imposes a schedule of payments, Defendant agrees that the schedule of payments is a schedule of the minimum payment due, and that the payment schedule does not prohibit or limit the methods by which the United States may immediately enforce the judgment in full.

The IRS will use the amount of restitution ordered as the basis for a civil assessment under 26 U.S.C. § 6201(a)(4). Defendant does not have the right to challenge the amount of this restitution-based assessment. See 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor defendant's timely payment of restitution according to that schedule will preclude

15

the IRS from immediately collecting the full amount of the restitution-based assessment. Defendant is entitled to receive credit for restitution paid pursuant to this plea agreement against those assessed civil tax liabilities due and owing for the same periods for which restitution was ordered. Defendant understands and agrees that the plea agreement does not resolve his civil tax liabilities, that the IRS may seek additional taxes, interest, and penalties from Defendant relating to the conduct covered by this plea agreement and for conduct relating to another time period, and that satisfaction of the restitution debt does not settle, satisfy, or compromise defendant's obligation to pay any remaining civil tax liability. Defendant authorizes release of information to the IRS for purposes of making the civil tax and restitution-based assessments.

Defendant understands that he is not entitled to credit with the IRS for any payment until the payment is received by the IRS. If full payment cannot be made immediately, defendant agrees to make a complete and accurate financial disclosure to the IRS on forms prescribed by the IRS (including, but not limited to, IRS Form 433-A and Form 433-B, as appropriate), and to disclose to the IRS any and all additional financial information and financial statements provided to the probation office. Defendant also agrees to provide the above-described information to the probation office. If Defendant makes a payment of the restitution agreed to above prior to sentencing, defendant agrees that he will sign

16

IRS Form 870, Form 2504, or other appropriate form enabling the IRS to make an immediate assessment of the liability underlying the restitution agreed to above. Defendant agrees that he will not claim a refund of the payment or otherwise challenge the existence or amount of the tax liability underlying the restitution agreed to above. If the amount of restitution identified above has not already been reduced to account for any such payments, the government agrees that the amount of the restitution to be ordered by the Court shall be reduced by a payment made in conformity with this provision.

Defendant agrees to send all payments made pursuant to the Court's restitution order to the Clerk of the Court at the following address:

United States District Court for the Eastern District of Michigan
Clerk's Office
Theodore Levin U.S. Courthouse
231 W. Lafayette Blvd, Room 599
Detroit, MI 48226

With each payment to the Clerk of the Court made pursuant to the District Court's restitution order, defendant will provide the following information:

A.    Defendant's name and Social Security Number;

B.    The District Court and the docket number assigned to this case;

C.    Tax years for which restitution has been ordered; and

D.    A statement that the payment is being submitted pursuant to the District Court's restitution order.

Defendant agrees to include a request that the Clerk of the Court send the information, along with defendant's payments, to the IRS address below:

> IRS-RACS
> Attn: Mail Stop 6261, Restitution
> 333 W. Pershing Ave.
> Kansas City, MO 64108

Defendant also agrees to send a notice of any payments made pursuant to this agreement, including the information listed in the previous paragraph, to the IRS at the following address:

> IRS-RACS
> Attn: Mail Stop 6261, Restitution
> 333 W. Pershing Ave.
> Kansas City, MO 64108

### E.    Special Assessment

The defendant understands that he will be required to pay a special assessment totaling **$200**, due immediately upon sentencing.

## 10.    Appeal Waiver

The defendant waives any right he may have to appeal his conviction on any grounds. If the defendant's sentence of imprisonment does not exceed the high end of the guideline range determined by the Court, the defendant also waives any right he may have to appeal his sentence on any grounds.

## 11.    Collateral Review Waiver

The defendant retains the right to raise claims alleging ineffective assistance of counsel or prosecutorial misconduct, as long as the defendant properly raises those claims by collateral review under 28 U.S.C. § 2255. The defendant also retains the right to pursue any relief permitted under 18 U.S.C. § 3582(c), as long as the defendant properly files a motion under that section. The defendant, however, waives any other right he may have to challenge his conviction or sentence by collateral review, including, but not limited to, any right he may have to challenge his conviction or sentence on any grounds under 28 U.S.C. § 2255 (except for properly raised ineffective assistance of counsel or prosecutorial misconduct claims, as described above), 28 U.S.C. § 2241, or Federal Rule of Civil Procedure 59 or 60.

**12.   Consequences of Withdrawal of Guilty Plea or Vacation of Judgment**

If the defendant is allowed to withdraw his guilty plea, or if the defendant's conviction or sentence under this agreement is vacated, the government may reinstate any charges against the defendant that were dismissed as part of this agreement and may file additional charges against the defendant relating, directly or indirectly, to any of the conduct underlying the defendant's guilty plea or any relevant conduct. If the government reinstates any charges or files any additional charges as permitted by this paragraph, the defendant waives his right to challenge

those charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

**13.    Use of Withdrawn Guilty Plea**

The defendant agrees that if he is permitted to withdraw his guilty plea for any reason, he waives all of his rights under Federal Rule of Evidence 410, and the government may use his guilty plea, any statement that the defendant made at his guilty plea hearing, and the factual basis set forth in this agreement, against the defendant in any proceeding.

**14.    Parties to Plea Agreement**

This agreement does not bind any government agency except the Tax Division of the United States Department of Justice and the United States Attorney's Office for the Eastern District of Michigan.

**15.    Scope of Plea Agreement**

This plea agreement is the complete agreement between the parties and supersedes any other promises, representations, understandings, or agreements between the parties concerning the subject matter of this agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to the defendant or to the attorney for the defendant at any time before the defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this plea agreement. If the

parties have entered, or subsequently enter, into a written proffer or cooperation agreement, though, this plea agreement does not supersede or abrogate the terms of that agreement. This plea agreement also does not prevent any civil or administrative actions against the defendant, or any forfeiture claim against any property, by the United States or any other party.

## 16.    Acceptance of Agreement by Defendant

This plea offer expires unless this plea agreement has been received, fully

signed, by the Tax Division by 12:00 P.M. on **December 23, 2022**.  The

government reserves the right to modify or revoke this offer at any time before the

plea agreement is accepted.

DAVID A. HUBBERT
Deputy Assistant Attorney General
Tax Division, U.S. Department of Justice

DAWN N. ISON
United States Attorney
U.S. Attorney's Office for the Eastern
District of Michigan

Jeffrey A. McLellan    2-14-23
Samuel B. Bean
Trial Attorneys
Department of Justice, Tax Division

Date: December ___ , 2022

By signing below, the defendant acknowledges that he has read (or been

read) this entire document, understands it, and agrees to its terms.  He also

acknowledges that he has had a full and complete opportunity to confer with his

attorney, and has had all his questions answered by his attorney.

Sanford Plotkin, Esq.
Attorney for Defendant

MATTHEW ADAMS
Defendant

Date: 2-14-23