## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

$\qquad$ **Plaintiff,**

**v.** $\qquad\qquad$ **CR. NO. 23-20013**

$\qquad\qquad\qquad$ **Hon. Matthew Leitman**

**MATTHEW ADAMS,**

$\qquad$ **Defendant.**

_____/

## DEFENDANT ADAMS'S MOTION FOR A DOWNWARD VARIANCE

Defendant Matthew Adams, through his attorney, SANFORD PLOTKIN, moves this Honorable Court grant a downward variance from the advisory guidelines.  In support of his motion Mr. Adams states as follows:

1.      Defendant pled guilty to a two count Information that charged him with money laundering in violation of 18 U.S.C. 1957, and corruptly endeavoring to obstruct and impede the due administration of the internal revenue laws in violation of 26 U.S.C. 7212(a).

2.      The probation department has determined Mr. Adams's advisory sentencing guidelines to be 151-188 months, and his criminal history category to be III.

3.      Defendant's criminal history is well overstated in the PSR.  As discussed below, because of the historical nature of the conduct, several misdemeanor convictions were counted despite occurring over 17 years ago.  (PSR, pars. 33-34).  Additionally,

certain misdemeanors were counted though they were conditional pleas under MCL

333.7411, and MCL 769.4, which were ultimately dismissed and the records sealed

pursuant to the statutory schemes.  (PSR, pars. 34,38).  Further, Defendant's 2015 drug

conviction from the Wayne County Circuit Court resulted from Defendant's obtaining

pills for Brandon Johnson; directly a part of this matter, i.e. related coduct.  (PSR, par.

37).  Finally, as the probation department has also pointed out, as Defendant Adams has

less than 7 criminal history points, the November 1, 2023 amendments would eliminate

the 2 status points he was assessed as a result of the 2015 Wayne County conviction.  The

reduction of the status points would place Adams in category II.

4.      The course of conduct commenced almost 17 years ago, and concluded

almost 7 years ago.  Matt Adams is a completely different, transformed individual from

the young, severely learning disabled, impressionable, 20 year-old day laborer that

Brandon Johnson  approached at GTJ to obtain his opiates to fuel his (Johnson's)

addiction.

5.      During the course of decades of practice in this District, the undersigned

counsel has never encountered such a gross disparity in the treatment of co-defendants

resulting from the government's charging decisions.    The advisory guideline range

belies Matt Adam's good character, post-offense rehabilitation, and positive contribution

to his community.  Counsel in no way minimizes the seriousness of the offense, nor

expresses these feelings lightly; but only after having gotten to know Matt Adams

intimately over the last 6 years  in a way that is a unique benefit of the attorney-client

relationship.  Defense counsel ultimately knows the true character and potential of their

clients, as well as the negative, in a way not possible for the government.

6.     Counsel submits that the gross unwarranted disparity in treatment between

Adams and Johnson is the core sentencing issue before the Court.

7.     Brandon Johnson, CEO of GTJ,  was the boss of the young, impressionable

Matt Adams.  Johnson approached Adams to procure his opiates.  Johnson embezzled

over 10 million dollars from the family business to finance the scheme over many years.

Johnson knew Adams was vulnerable and always desperate for a job, as he was severely

learning disabled, and had few options at that time in his life.  Johnson created this

monster.  Yet, the government allows him to plead guilty to a tax charge, exposed to

almost 10 years less prison time than Matt Adams.

8.     In stark contrast, the government forces Matt Adams, the young,

impressionable, learning disabled day laborer to plead guilty to money laundering

guidelines with an advisory range of 151-188 months, in addition to a tax charge. Matt

Adams was forced to risk his life for years in the streets to procure Johnson's drugs,

resulting in him having been stabbed, shot at, convicted of the Wayne County drug case,

and otherwise exposed to dangerous street life for all those years.  There is no suggestion

or evidence that Adams supplied drugs to anyone but Johnson.  But for Johnson, none of

this would have happened.

9.     Why should Johnson, the creator and financer of the scheme, not be

charged with money laundering conspiracy, as well?  Yes, Adams would enjoy the fruits

of the venture for some time, undeniably.  He also knew it was a ticking time bomb that had gotten out of hand.  He knew it was only a matter of time before the scheme would come crashing down.  Not a day goes by that Matt Adams wishes he simply said no to Johnson's advances.  Sadly, in that 20 year-old's reality, desperate for a job he thought he would never have, he just could not say no.  As he grew and matured, he realized what a grave mistake he had made.

10.     Yet, in all fairness, none of this could have been possible without Johnson's embezzlement and initiative.  Giving him a pass on money laundering serves to create an unconscionable disparity of treatment that must be corrected at sentencing.

11.     Moreover, Adams retained this counsel when he realized that he was being investigated by the IRS for criminal violations.  Counsel immediately contacted various AUSAs and agents in order to arrange for a Kastigar meeting.  Adams disclosed the entire scheme at that 2018 meeting.  Adams was truthful and honest.  The purpose of the meeting was to explain the overall scheme, acknowledging its complexity and that he did not yet really have a handle on the numbers, as this went on for years. He did not intentionally lie or deceive.

Yet, the government seized on an isolated comment to allege that Adams lied and would turn to Johnson to cooperate against Adams.  Counsel, unaware of the government's position, persisted in attempting to arrange follow up meetings over time, as is customary in these Kastigar settings, where Adams would have been able to flush out and clarify all material facts of the case.

12.     Counsel submits that the advisory range well overstates the severity of this unique drug and tax offense, Mr. Adam's conduct, and his overall life and history.  A significant time has passed since Matt Adam's participation in the offense, which significantly lessens the impact and purpose of incarceration in terms of the 18 U.S.C. 3553(a) factors.  The extreme passage of time, coupled with the extreme disparity in treatment, calls for a significant downward variance.

13.     Dr. Miller's comprehensive forensic report describes in detail the young, vulnerable, severely learning disabled young man that was hired to be a day laborer almost 20 years ago.  (Sealed Exhibit, attached hereto).  Dr. Miller's report addresses in detail many considerations dictated by 18 U.S.C. 3553(a).

14.     Dr. Miller's evaluation details the difficult life and early challenges of Matt Adams: how his cognitive limitations likely left Matthew vulnerable to Brandon Johnson's (his boss's) unfortunate advances.  Brandon Johnson was the adult in the room exerting much influence over a desperate, challenged, young employee.

15.     The PSR details the facts of the scheme.  The purpose of this memorandum is to discuss the facts and traits of Matthew Adams, his predisposition to Johnson's influence, the unwarranted disparity of treatment, and the reasons why lengthy incarceration is not warranted in this matter.

16.     The advisory range overstates the severity of Mr. Adam's conduct, and his life history and subsequent rehabilitation, and the fact that Matthew Adams is a transformed individual who will likely **never again commit a criminal act.**

17.     Matthew Adams is not the younger, immature, misguided individual who involved himself in this conspiracy when he was 20 years old, 17 years ago.  He has tried very hard in the last 6 years to establish a firm foundation and move forward through hard work, dedication to family and friends, and accepting his limitations:  for now, he is back to day laboring in an effort to support his family and live a satisfying, law abiding life.  ( See letter of Anthony Cavataio, Ex. 1, character letters).

18.     Matt Adams's father is living alone with several significant health issues.  Matt is the only reliable caretaker he has available to him on a regular basis.  Matt checks on him daily, and is responsible for making sure he gets to the hospital when necessary.  He is very concerned about his care if Matt were to be taken away for an lengthy period of time.  (Ex. 1, Sam Andary,  Character letters).

19.     Counsel sincerely submits that Matt Adams poses no danger to the community, and virtually no risk of recidivism.  If the Court feels that a period of incarceration is necessary to achieve the purposes of 18 U.S.C. 3553(a), then a period of 24 months, together with a term of supervised release, would be sufficient but not greater than necessary to meet the 3553(a) sentencing goals.  Moreover, if the Court is convinced, as this counsel is, that the events from 7-17 years ago will never again be committed by this older, transformed man, then perhaps imposing home confinement would allow this positive path to continue, allow Adams to continue to support his family, and care for his father, as there is no one else available for that role.

WHEREFORE, Defendant Adams respectfully requests this Honorable Court grant a significant downward  variance to allow him to continue on his most positive path through his post-offense rehabilitation and community contribution.

<div style="margin-left:40%">

Respectfully submitted,

**<u>Sanford Plotkin</u>**

SANFORD PLOTKIN (P38691)

Attorney for Defendant

30445 Northwestern Hwy, Ste. 225

Farmington Hills, MI  48334

248-798-5756

sanfordplotkin@gmail.com

</div>

Dated:  February 26, 2024

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

 **v.**        **CR. NO. 23-20013**
            **Hon. Matthew Leitman**

**MATTHEW ADAMS,**

    **Defendant.**
_____/

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR A DOWNWARD  VARIANCE**

**Introduction**

Let there be no doubt that Matthew Adams is a man guilty of having committed a serious offense, and nothing in this Memorandum is an attempt to trivialize or argue that the offense is a minor matter.  At the same time, in fairness to Mr. Adams, counsel feels compelled to say that as a long-time practitioner in this District, it is rare that I come across an individual as deserving of a shot at redemption and compassion as Matt Adams; coupled with a unique fact pattern that may never again be repeated between  employer and employee addicts, certainly not on this scale.

Indeed, counsel labors under extreme anxiety and frustration that he may not be able to effectively convey the truly rehabilitated man who is to appear for sentencing on Monday, March 4, 2024.  These are not empty words.  They are the words of a weary

defense counsel, faced with the privilege and responsibility to paint the real picture of

Matthew Adams prior to this Court's passing of judgment on the Defendant.  It is

counsel's hope that by describing the circumstances of Mr. Adam's offense, his post-

offense rehabilitation, his extreme contrition and shame, his family circumstances and

challenging background, that if the Court finds a sentence of incarceration to be

necessary to meet the requirements of 18 U.S.C. 3553(a), that it be a period significantly

below the advisory range.  There are numerous reasons which support a significant

downward variance in this case.

### Applicable Facts and Law

Adams will forgo the usual recitation of the importance and meaning of *U.S.* v.

*Booker,* 543 U.S. 220, 2005 and various Sixth Circuit case law interpreting and following

*Booker* because the Court is intimately aware of and familiar with the law of sentencing

as well as the oft-cited analysis of 18 U.S.C. 3553.

### Sentencing Factors to be Considered By The District Court

### 18 U.S.C. 3553(a)(1)

### The Nature and Circumstances of the Offense
### and the History and Characteristics of the Defendant

Matthew Adams is a kind, generous, fiercely loyal soul, whose true character and

decency is in such stark contrast to his involvement in what appears on the surface of this

case.  Counsel is attaching letters from various people in Mr. Adam's life, including

family and friends, all of which contain an internally consistent statement:  Matt Adams

is a truly loyal, loving, and caring friend, step-father,  son, brother, and husband; and

those who know him best are utterly shocked that he would be facing a harsh sentencing on these charges.  (Ex. 1, Character letters).

These letters are sincere and informative.  They paint the true picture of Matt's sincere dedication to his work and family; and the extremely positive path he has been on for the last six years, since the bulk of this offense occurred.  Those letters, those statements of his family and friends, are consistent in their description of a devoted father, friend, and employee, who only wants to continue on that path of redemption. Counsel urges this Court to examine those letters carefully, and to please appreciate the consistent message of Adam's huge, constructive potential, as well as his extreme shame, embarrassment, and remorse at, not only his own involvement in this case, but at having damaged other loved ones who he cherishes, his long-time girlfriend , Abbey, and her daughter Kayla, who Matt has raised and loved as his own.  He also lives in fear of not being around to care for his infirm father.

Matt Adams had a very difficult and painful childhood.  He suffered an extremely difficult learning disability, dyslexia.  He could not read or write for the longest time.  He felt school was a hopeless endeavor, and more likely a source of mockery and shame.  His overwhelming shame and disabilities left him with an actual school phobia.  Dr. Miller has detailed Matt's childhood and disabilities very effectively in his evaluation, attached to this memorandum.  Counsel will rely on Dr. Miller's report in covering large portions of the 3553(a) factors.

Matt could not get through high school.  Between his severe dyslexia and phobia, he felt hopeless.  Thanks to a school social worker, Doug Robey, Matt was referred to the Michigan Youth Challenge Academy in Battle Creek.  He began the program in 2003, and ultimately was able to teach himself how to read.  He could not pass the GED,  but he left with many effective life skills, including an ability to read.  He felt somewhat more optimistic.

When he reached his late teens and early adulthood, Matt was still fearful that he may never be able to find a job.  He returned to his father's home in Grosse Point Park, in what is referred to as the "Cabbage Patch", home to many hard-working middle class families.  His father, a former member of the Carpenters Union, owned a duplex.  He was renting a flat to a friend of the Johnson family, who worked for GTJ.  Matt saw the van in the driveway and asked his father what GTJ was.

Adam's father was familiar with the Johnson family and was able to arrange for Matt to be interviewed by the family for a possible job.  The Johnson's seemed fond of Matt, and his serious and respectful attitude, and offered him a job as a day laborer.

Matt was unbelievably grateful for the employment opportunity.  He never believed he would be able to find employment.  He loved his job.  He was grateful to the Johnson family for giving him the opportunity.  Matt is an extremely loyal person to those in his life.  He would do anything he could to help those in his circle.

Matt also looked up to Brandon Johnson as not only a boss, but a father figure as well.  Matt's loyalty streak, coupled with a strong desire to please his boss/father figure,

left him vulnerable to Johnson's demands, as well.  Matt was predisposed to be

vulnerable; and coupled with his desperation to hold onto his precious employment, it

would lead to tragic consequences for both Adams and Johnson.

According to a long-time GTJ employee, Kevin Brown, there was an abusive pill

culture involving the tight knit group of employees at GTJ well before Matt began his

employment.  Many of the laborers were using pain pills on a daily basis.  Matt Adams

did not introduce opiates to GTJ.

Tragically, when he was 20, 17 years ago, this case began.  He was approached by

Brandon Johnson to get him opiates. Desperate to hold onto his job, he agreed.  Matt was

apart from the main group and was perhaps a safer source for Johnson to use.  The

scheme was not necessarily well thought out.  However, Johnson began embezzling what

would total millions of dollars from the family company to pay Adams to hit the streets

and find his pills.

Kevin Brown began working for GTJ as an independent contractor in 1998,

cleaning out vacant homes which GTJ acquired through Freddie Mac and Fannie Mae.

He immediately observed employees, using pills daily.  Over time, Brown told this

counsel that he heard Johnson continually push Adams to get him pills from the streets.

It essentially became a second full time job for Adams.

Adams was the only one of the crew that held a CDL.  Brown has said that it was

not uncommon that Johnson disrupted their work days by texting Adams and insisting

that he drop everything, return the crew to GTJ's offices, and go out to find him more pills.

While the financial facts are detailed in the PSR, there are some crucial human details of this offense that are essential to consider in reaching a fair sentence.  The scheme entered into by Adams and Johnson obviously got way out of hand.  Counsel does not believe that either Johnson or Adams began this activity with any idea of how out of hand things would get before they came crashing down.  Johnson was obviously a desperate addict, and Adams was an impressionable, young man, oh so eager to please his boss and father figure.  Matt would also get addicted to pain pills after a hand fracture on the job.

Dr. Miller's report details an interesting insight into how this scheme continued to gather unfortunate steam:

> In 2009, my mother died, and all the shit broke loose, and the economy was down.  I went to his family and asked for money for my mother's funeral…like $8000-$9000, and they gave it to me.  I was beyond thankful and grateful.  I was mourning my mom and on the actual day of the funeral Brandon asked me for more Oxy's.  I saw that he was addicted but I wanted to make him happy because he had just paid for my mom's funeral.

> Miller Report, p. 10, par. 2. (Sealed Ex. 1).

Matt's loyalty to Johnson only grew stronger, along with his desire to please his boss and maintain his employment.  At the same time, the pill scheme would continue to grow out of control.  Matt would hit the streets constantly looking for pills.  He had no particular source but made his way through the streets constantly looking for pills. Over

time, this led to Adams being shot at, stabbed, and arrested and convicted in Wayne

County Circuit Court for possession of pills.  It must also be noted that there is no

evidence or suggestion that Matt Adams distributed pills to anyone other than Brandon

Johnson.  This case is a bizarre tale of two men, who became addicts, and spiraled out of

control for many years.

Adams would spend an exorbitant amount of money on luxuries and things that he

never imagined would be a part of his life.  Johnson would use millions of dollars' worth

of pills over those years, and miraculously remain alive.

Most importantly, Adams's conduct did result in tax violations and money

laundering.  However, he was far from a sophisticated, scheming criminal mastermind

plotting with any kind of deliberation.  According to Dr. Miller:

> These findings, in the aggregate, do not, in my opinion, support the
> conclusion that Mr. Adams engaged in a sophisticated plan to "money
> launder" in order to deceive the IRS.  Rather, lacking an appreciation
> of the "big picture", and due to his cognitive limitations, he simply
> attempted to solve one problem at at time; resulting in a mishmash of
> "solutions," which, apparently, appeared to the IRS in their investigation
> as "planned money laundering" and "undeclared income".
>
> Miller Report, p. 22. (Ex. 1).

However, this is not at all to say that Adams did not appreciate that he and

Johnson were committing financial and tax crimes through the scheme.  He brought that

up to Johnson numerous times.  He knew he had gotten in too deep. Adams knew it was a

matter of time before the entire scheme would implode.

Implode it did.  Adams retained counsel when he was confronted by the IRS with this scheme during his civil audit.  Adams did try to cooperate with the government and disclose the details of the scheme during a proffer arranged by counsel.  The goal of the first meeting was for Adams to fully blow the whistle on his and Johnson's activities.  He did so as best he could.  It was made clear that he did not have a handle on all the finances.  The government never did get back to counsel.  Rather, the Tax Division made a decision that Matt "lied" about his profits and turned to Johnson to cooperate against Adams.

The government has the prerogative to make that harsh assessment, and they have.  However, it is the radical disparity in treatment between Adams and Johnson that risks leading to such a unjust sentencing result.

Adam's involvement with Johnson was tragic, stupid, and self-destructive.  The money Adams earned from the scheme was spent impulsively and has left him financially ruined.  Not a day goes by that Adams does not regret accepting Johnson's advances, many years ago.

In the last 6 years or so, Matt has tried to move forward through hard and legitimate work.  He purchased a Buscemi's franchise in Grosse Pointe Park, but was never really able to get it going on all cylinders.  He was ultimately forced to sell at a loss due to the COVID-19 pandemic.  He did make a concerted effort to feed first responders during that time, as well.  That is an example of his inherent generosity and desire to help others in need.

He would attempt to buy and rehab homes.  The IRS foreclosed on one of his rental homes several years ago.  He was able to rehab a home in Harper Woods, where he allowed a sister in need to reside.   Matt has also allowed his drug addicted brother to stay at his home to prevent him from being homeless at times.  Matt is very dedicated to his friends and family, and the loyalty he showed Johnson is now showered in the healthier direction toward those loved ones in his life.

Sadly, Adams is worse off now in some ways than before he met Brandon Johnson.  He has lost almost all his assets.  His credit is destroyed.  He is now working again, however, as a laborer for his longtime friend, Anthony Cavataio, owner of Wolverine Textures, a home improvement company.  (Ex. 1, letter of Cavataio). According to Cavataio, "Matt has become an integral part of my workforce, and his absence will be detrimental to my company…On a professional recommendation, I can vouch on his attendance, commitment, reliability, and trustworthiness.  Matt is hardworking, follows commands and instructions and asks for directions when needed. Matt makes himself available with varying, long work hours, including weekends and all-weather situations.  Matt is kind, with a mild-mannered personality and spirit that makes working and socializing with him enjoyable.  He is genuine, generous, and true in his convictions.  My family has been impacted by his values and virtues, and interacting with my wife and kids has been important to us all.  Our children refer to him as Uncle Matt. My 8-year-old son who comes along on my job sites increasingly looks up to him.  From

Matt's patience and kind interactions, with nurturing mentoring, shows his character and morality." (Id.).

Another long-time friend of Adams, Kirsten Renard, has also written to the Court. (Ex. 1, letter of Renard). The themes of loyalty and generosity are seen in her words, as well. "He has always been a dependable figure in the community and has offered support and assistance to anyone who requires it…Matt has been a father figure to his girlfriend's daughter, whom he raised from a young age. He has provided a stable home environment for her and has nurtured her growth into a young adult. When she expressed her desire for Matt to legally adopt her, it was a testament to the love and care he has shown her throughout her life…Matt has opened his home to many family members who have needed help…his acts of kindness have touched the lives of countless individuals…Matt stepped up to the plate during the pandemic and took it upon himself to feed as many first responders as he could…" (Id.).

And so, a reckless, desperate, and immature decision by Adams 17 years ago, which conduct ceased nearly 7 years ago, now risks destroying such tremendous post-offense progress and rehabilitation. He is finally grounded and back to hard work for and with his friend's company on a full time basis. He has a loving step-daughter he adores and assumes tremendous responsibility over; a long-time girlfriend he plans to marry and support and care for; a loving and caring support system.

Moreover, Matt has assumed the responsibility of caretaker for his ill father. He checks on him regularly, visits him when he is hospitalized, and cares anyway he can for

his father's well-being.  Mr. Andary has written to the Court that Matt is the only child available to assume these caretaking responsibilities; the other siblings are drug addicts or otherwise irresponsible and incapable.  (Ex. 2, Letter of Sam Andary).

The Eastern District of Michigan has recognized the tendency of the advisory guidelines for money laundering to overstate the seriousness of the offense.  Over the period of this offense, 2009-2015, our district imposed sentences below the guidelines for non-government sponsored reasons in 38.8% of those cases.  Equally important, the mean percentage decrease from the guidelines was a 61% reduction.  Further, there were government sponsored downward adjustments in 32.5% of those cases and the mean percentage decrease granted in this district was 74.2%.  See, Table from USSC Interactive Sourcebook for Below Range Cases:   Degree of Decrease for Offenders in Each Primary Offense Category, filtered by district and covering the years 2009-2015.


### (a)(2)(a)
### To Reflect the Seriousness of the Offesne, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Much of this discussion has been addressed above.  However, some important points are relevant to this aspect of the sentence.

First, as discussed in the above motion, Defendant's criminal history is well overstated in the PSR.  As a result of the historical nature of the conduct, several

misdemeanor convictions were counted despite occurring over 17 years ago.  (PSR, pars. 33-34).  Additionally, certain misdemeanors were counted though they were conditional pleas under MCL 333.7411, and MCL 769.4, which were ultimately dismissed and the records sealed pursuant to the statutory schemes.  (PSR, pars. 34,38).  Further, Defendant's 2015 drug conviction from the Wayne County Circuit Court resulted from Defendant's obtaining pills for Brandon Johnson; directly a part of this matter.  (PSR, par. 37).  Finally, as the probation department has also pointed out, as Defendant Adams has less than 7 criminal history points, the November 1, 2023 amendments would eliminate the 2 status points he was assessed as a result of the 2015 Wayne County conviction.  The reduction of the status points would place Adams in category II.  The Court can adjust Adams criminal history category as it sees fit; or at least consider this overstated history as a factor for a downward variance in the guidelines.

According to the Probation Department's assessment of the need to afford adequate deterrence to criminal conduct, " Due to the fact that the defendant has never served any time in custody, any period of imprisonment may be sufficient to provide individual deterrence."( PSR, p. 24, par. 81).

However, there are additional facts that the probation department has not considered.  Any separation from his family will be incredibly traumatic.  He is horribly frightened at the prospect of not being able to care for Abbie, Kayla, and his father.  Matt's a completely different person than he was 17 years ago, 10 years

ago, 6 years ago.  He's tried extremely hard to be real about his past, accept responsibility for his misdeeds, but also move forward as constructively as possible to provide for his family.  His subsequent life changes, including the essential starting of a family, and finding realistic work even as a day laborer, make the likelihood of recidivism even more remote.  There is no question that Matt Adams will do everything in his power to care for his family.

The Guidelines fail to account for the strong family and community support Adams has behind him.  But the Court should take note of the tremendous love and support Matt Adams continues to receive from his family and friends, despite the charges against him.

This will be Matt Adam's first "real" criminal sentence.  Therefore, any sentence the Court imposes will have a great and lasting impact on him.  Any term of incarceration will be a dramatic, traumatic, and dispiriting event in his life. Courts have held, and common sense dictates, that a prison term means more to the first-time offender than to a defendant who had previously been incarcerated. Therefore, as probation has suggested, **any** custodial term, even a below Guideline sentence, will wield powerful punitive impact on Mr. Adams.   This rationale dovetails with a similar yet related concept:  there is significant evidence that even relatively short sentences can have a strong deterrent effect on certain offenders.

See, *U.S.* v. *Adelson,* 441 F. Supp. 2d 506, 514 (SDNY 2006) (citations omitted);

Richard Frase, Punishment Purposes, 58 Stanford Law Review 67, 80 (2005).

## **Conclusion**

Matthew Adams is committed to and loves his family.  His step-daughter and longtime girlfriend's', soon to be wife's, well-being, along with his father's, are paramount to his life.  There is no greater concern in the entire world than what will happen to his family if he is incarcerated and loses any ability to support them.  He has already punished himself severely for the disgrace and harm he has caused his family.  Moreover, Abbie has been the target of abuse of neighborhood Facebook sites ever since this case hit the news.  Adams and his family have been feeling the punishing fallout from this for sometime.

Adams has also lamented that he was actually in a better state 20 years ago as a laborer.  He is back there now; except that he has lost almost all of his assets and his credit is ruined.  He will also be followed by a huge judgment for many years.

At the same time, Adams has made much good of the last 6 years.  His post-offense conduct has proven that he is on a corrected, positive path, suggesting the possibility of recidivism is remote.  He is no longer the younger, immature, and impulsive youngster who foolishly entered this scheme.  He is older, wiser, and living a completely transformed life.

Speaking frankly, and from the heart, counsel just cannot imagine the utility of incarcerating Matt Adams.  I cannot imagine how fracturing his family, and removing him from community, will make that community safer or more productive.  Yet, counsel understands that some period of incarceration is in the cards for Mr. Adams.

Matt Adam's future is bright., if given the opportunity.  His risk of recidivism is quite likely zero.  He has worked incredibly hard to make that so. Sentencing Mr. Adams to a long prison term would likely upset the ultimate objectives of our sentencing scheme.  Counsel respectfully asks that this Court recognize Mr. Adam's true character, remorse, and positive potential, by sentencing him to a term of incarceration significantly lower than the advisory guidelines, which will only serve to undermine all of the progress made, and all of the positive potential Mr. Adams can contribute to his community in the years to come.

**Respectfully submitted,**

**Sanford Plotkin**
SANFORD PLOTKIN (P38691)
Attorney for Defendant
30445 Northwestern Hwy., Ste. 225
Farmington Hills, MI 48334
248-798-5756
sanfordplotkin@gmail.com

February 26, 2024